200 F.3d 1237 (9th Cir. 2000)
 MARILYN PRICE, Guardian Ad Litem for LOHREN PRICE, CHERYL CRAMER, Guardian Ad Litem for DANIEL MASON, and NICOLE CRAMER, Guardian Ad Litem for NICHOLAS CRAMER, Plaintiffs-Appellees,
v.
ALBERT KRAMER, STEPHEN D'ANJOU, JOSEPH DELADURANTEY, and CITY OF TORRANCE, Defendants-Appellants.
 Nos. 97-56580, 98-55484
 U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted June 7, 1999
Filed January 11, 2000
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 COUNSEL: Robert D. Acciani, Senior Deputy City Attorney, Torrance, California, Martha A. Shen, Ginsburg, Stephan, Oringher & Richmond, PC, Los Angeles, California, for the defendants-appellants.
 Howard R. Price, Brodey & Price, Beverly Hills California, for the plaintiffs-appellees. Alan Rubin, Epstein, Adelson, & Rubin, Los Angeles, California, for the plaintiff appellees.
 Appeal from the United States District Court for the Central District of California; J. Spencer Letts, District Judge, Presiding. D.C. No. CV-06506-JSL
 Before: Dorothy W. Nelson, Stephen Reinhardt, and Stephen S. Trott, Circuit Judges.
 OPINION
 REINHARDT, Circuit Judge:
 
 
 1
 Three teen-age boys, two African-American and one white, brought a civil rights lawsuit in federal district court alleging that City of Torrance police officers illegally stopped their vehicle, conducted an illegal search of their car, and used excessive force in searching them, causing them bodily injury. They also alleged that the officers' conduct resulted from racial bias. The jury found in favor of the plaintiffs and awarded them $245,000 in compensatory and punitive damages. The defendants in the case, City of Torrance police officers Albert Kramer and Stephen D'Anjou, the City of Torrance, and the Torrance Police Chief, appeal the judgment below. We reverse the district court's failure to dismiss the City of Torrance and the Torrance Police Chief from the action. We affirm the district court's judgment in all other respects.
 
 FACTUAL BACKGROUND
 
 2
 To understand the events that follow, one needs to know a bit about the geography and demographics of the Los Angeles metropolitan area. The principal city is the City of Los Angeles. There are a number of smaller communities, some incorporated, some unincorporated, that adjoin or even fall within the territory that comprises the City of the Angels, as Los Angeles is sometimes fondly called. Beverly Hills, for example, is completely surrounded by Los Angeles, and Santa Monica partially so. The City of Torrance adjoins Los Angeles along most of Torrance's eastern border, while parts of Los Angeles lie both north and south of the smaller municipality. A person going from his home in Los Angeles to work or to school in another part of the city may pass through one or more other cities including Torrance, or through unincorporated areas, or both. According to the 1990 Census, Torrance is a predominantly white community, in which blacks comprise only 1.5 percent of the population. By comparison, in the City of Los Angeles, the majority of the population is non-Caucasian, and 15 percent is black. The law enforcement needs of some of the communities in the Los Angeles area, both incorporated and unincorporated, are served by the Los Angeles County Sheriff's Department. The City of Los Angeles and the City of Torrance, however, each has its own police department.
 
 
 3
 On May 27, 1994, Lohren Price, Daniel Mason, and Nicholas Cramer, all seventeen-year-olds, attended their last day of prep school at Harvard-Westlake Preparatory School in Los Angeles. That evening, the boys decided to celebrate their graduation by going to see the Eddie Murphy movie Beverly Hills Cop 3. After the movie let out, they drove south toward Mason's house. They took Crenshaw Boulevard, a major north-south artery that runs through both Los Angeles and Torrance. Price and Mason, who are black, were in the front seat of Price's mother's car, a 1979 Chevrolet. Cramer, who is white, was lying down on the back seat because he was tired. The boys were having fun, discussing the colleges they planned to attend and reminiscing about high school, so they decided to pass Mason's home and cruise around to talk some more before returning home for the night. At some point, Price realized that they needed gas and that they would have to stop at a service station along the way.
 
 
 4
 The boys continued to drive south on Crenshaw Boulevard. In doing so, they left Los Angeles and ended up in Torrance, without attaching any particular significance to that fact. They were approximately seven to ten minutes away from Price's and Mason's homes in Los Angeles, and barely within the municipal boundaries of Torrance when still headed southbound on Crenshaw, they stopped at a red light. A City of Torrance patrol car was stopped at the opposite traffic light, headed northbound on that same boulevard. After the light changed, the two vehicles passed each other. At trial, Officer Kramer admitted that when the cars passed, he saw only the two black teens, Price and Mason; Cramer, the white teen, was not visible to the officers. The patrol car immediately made a U-turn, accelerated to catch up, and then proceeded to follow Price's vehicle from approximately two car lengths behind.[1]
 
 
 5
 The boys noticed that the patrol car had turned around and was now following them.[2] Price proceeded to drive within the speed limit, at 30-35 mph. Cramer, who had been dozing in the backseat, sat up and looked out the rear window. Price continued on to a Chevron station a few blocks ahead. He slowed down, applied his right-turn signal, and carefully entered the station. Price and Mason discussed taking particular pains not to make any sudden or precipitous moves that might raise the suspicions of the police officers. The patrol car also entered the station and stopped behind the boys at the pump where they were getting gas. The patrol car first parked perpendicular to Price's car, where the officers waited, staring directly at the newly graduated students. The officers then drove around, parked parallel to their car, and continued to stare. The officers next pulled out of the station and went to a parking lot across Crenshaw, where they sat, continuing their surveillance. By this time, the boys had become concerned about the officers' behavior, and they decided to go home. They pulled out of the gas station, turned onto Crenshaw, and headed northbound out of Torrance and back toward Mason's home in Los Angeles.
 
 
 6
 The officers pulled onto Crenshaw to follow the boys' vehicle. The patrol car ran a red light and caught up with the boys' car. While still behind it, the officers turned on their flashing lights. Price did not think that he had done anything wrong, but pulled over immediately. At trial, the officers testified that they made the stop because of a defective taillight and seatbelt violations. Officer Kramer testified that he first observed these traffic violations after the boys' car left the gas station and started heading north up Crenshaw. The plaintiffs argued that for various reasons it was evident that the defective taillight violation was completely fabricated. They acknowledged that two of the boys were not wearing their seatbelts, but asserted that the officers could not have known that fact until after stopping Price's car.[3]
 
 
 7
 Officer D'Anjou came to the driver's side of the car with his gun drawn and pointed directly at Price. Officer Kramer approached from the other side and pointed his gun at Mason's head. Mason could see D'Anjou's gun out of Price's window and Kramer's gun out his own. Officer D'Anjou asked Price for his driver's license and registration which Price handed him.
 
 
 8
 The teens were taken out of the car one at a time, and, while Officer D'Anjou kept his gun pointed at them, Officer Kramer conducted a pat-down search of each boy. Officer Kramer weighed 300 pounds and could bench press nearly 500 pounds. Officer Kramer told each boy to lock his hands together behind his head. He then gripped the teens by their hands and forcefully yanked their bodies backwards onto the curb. During the ensuing search, Officer Kramer grabbed each boy's testicles, pulled down on and then forcefully squeezed them. All three boys experienced severe pain, including nausea and extreme soreness. In each case, the sharp pain lasted throughout the questioning which followed. Mason explained, "my throat had swollen up, it felt like I swallowed a grapefruit, I had this tremendous pain in my stomach, I wanted to throw up, and I was just trying to . . . answer these questions."
 
 
 9
 Officer Kramer separately asked Price and Mason, the two African American teens, "What are you doing out here?" The questions that Officer Kramer asked Nicholas Cramer, the white teen, were of a very different character. He asked Cramer, "Do you know the two men in the car with you?" Cramer answered, "Of course." The officer next asked Cramer if the other two boys were his friends. Cramer answered, "Yes." Officer Kramer then questioned Cramer as to how long he had known the two young blacks.
 
 
 10
 Following the questioning, the boys were instructed to sit on the curb. While they were seated there, Officer D'Anjou kept his gun trained on them and instructed them not to speak to each other. Officer D'Anjou taunted Mason by aiming his gun at him and remarking, "You look like you have something on the tip of your tongue that you want to say, why don't you say it."
 
 
 11
 Meanwhile, Officer Kramer searched Price's car. He never asked permission to search the vehicle, and questioned Price only as to where his car keys were. Having obtained the keys, Officer Kramer searched the front seat, the glove compartment, the back seat, and underneath the front seat. He then opened the hood of the car, searched in the engine compartment, and opened the trunk. In the trunk, he found a box of papers belonging to Marilyn Price. He emptied out the contents of the box and rummaged through them. Officer Kramer then tested all the lights on the car. After the search failed to turn up any evidence of wrongdoing, Officer D'Anjou gave Price a citation for "inoperative turn signals " and for not wearing his seat belt. Officer Kramer issued a citation to Nicholas Cramer for not wearing a seat belt. He told Mason "You're not supposed to be here." The boys were then told to "get the hell out of here." Before leaving, Mason tried to look at the officers' name tags and badge numbers, and was able to get both their names. The stop lasted approximately one hour.[4]
 
 
 12
 After going home, each boy promptly told his parents about the incident. The three families acted immediately. One plaintiff's father was an Assistant City Attorney for the City of Los Angeles and another's father was a lawyer at one of Los Angeles's oldest and largest law firms, while the mother of one of the plaintiffs had been a Probation Officer for over ten years. The day after the incident, Cramer's father, the assistant city attorney, wrote a letter of complaint to the Torrance Chief of Police. That day, Mason's father went with his son to the Torrance Police Department and filed a formal complaint. The three families also immediately retained a lawyer, who subsequently filed this lawsuit in federal district court.
 
 
 13
 The defendants appeal the judgment in plaintiffs' favor, entered after a trial before a jury. The defendants argue that the judgment should be reversed for several reasons: (1) an erroneous pretrial order denying defendants summary judgment on the basis of qualified immunity; (2) the district court's failure to grant the defendants qualified immunity after the conclusion of the testimony at trial; (3) the erroneous admission of evidence concerning racial bias; (4) the admission of improper lay opinion testimony; (5) juror misconduct; (6) the district court's failure to conduct an impartial trial. In addition, the City of Torrance and the Torrance Chief of Police urge that the district court erroneously failed to enter judgment in their favor after the plaintiffs abandoned all claims against them. Only the latter point has merit.
 
 ANALYSIS
 
 14
 I. Post-trial appeal of pre-trial denial of qualified immunity
 
 
 15
 The defendants argue that the district court's pre-trial order denying the officers qualified immunity was improper. We do not reach the merits of this claim, because the issue is not reviewable on this appeal. In Locricchio v. Legal Servs. Corp., 833 F.2d 1352, 1358-59 (9th Cir. 1987), we announced the rule that "the denial of a motion for summary judgment is not reviewable on an appeal from a final judgment entered after a full trial on the merits." Id. at 1359; see also Lum v. City and County of Honolulu, 963 F.2d 1167, 1170 (9th Cir. 1992). The Locricchio court explained the rationale behind refusing to overturn a jury verdict on the basis of the evidence and arguments that existed before trial:
 
 
 16
 To be sure, the party moving for summary judgment suffers an injustice if his motion is improperly denied. This is true even if the jury decides in his favor. The injustice arguably is greater when the ver dict goes against him. However, we believe it would be even more unjust to deprive a party of a jury ver dict after the evidence was fully presented, on the basis of an appellate court's review of whether the pleadings and affidavits at the time of the summary judgment motion demonstrated the need for a trial.
 
 
 17
 Locricchio, 833 F.2d at 1359. For good reason, Locricchio now reflects the prevailing view among the federal circuits.[5]
 
 
 18
 We see no reason to deviate from Locricchio in the present context. In fact, there is even less reason to permit a post-trial appeal of a pretrial denial of qualified immunity. In qualified immunity cases, unlike almost all others,[6] a denial of a motion for qualified immunity as a matter of law is appealable as of right on an interlocutory basis. Behrens, 516 U.S. at 313; Mitchell v. Forsyth, 472 U.S. 511, 530 (1985). Defendants thus have multiple opportunities to appeal a denial of qualified immunity before the final judgment. Behrens, 516 U.S. at 307-10. Of course, "determinations of evidentiary sufficiency at summary judgment are not immediately appealable merely because they happen to arise in a qualified-immunity case . . . [S]ummary judgment determinations are appealable when they resolve a dispute concerning an `abstract issu[e] of law' relating to qualified immunity." Id. at 313 (quoting Johnson v. Jones, 515 U.S. 304, 317 (1995)). In the present case, the defendants did not avail themselves of their right to an interlocutory appeal of the pre-trial ruling, if indeed they had one. Having failed to take whatever timely opportunity existed, they now ask us to review the pre-trial qualified immunity order as though the subsequent trial and jury verdict had never transpired. Notably, during oral argument, defense counsel could not provide the court with a reason for their not having filed such an interlocutory appeal, aside from the fact that the time for doing so eventually elapsed. The defendants' complaint to us now -that in retrospect the officers should have been immune from suit at the time of the pretrial order -is long past due and unreviewable on this appeal.[7]
 
 II. Appeal of final judgment
 
 19
 The defendants also contend that, after the presentation of evidence at trial, the district court should have issued a judgment as a matter of law granting the officers qualified immunity on all of the plaintiffs' claims. The plaintiffs' suit was based on allegations that the officers' wrongful conduct included: (1) an illegal stop; (2) an illegal search of the vehicle; and (3) the excessive use of force. The critical facts were in dispute. A judgment as a matter of law is appropriate when the evidence permits only one conclusion. Lawson v. Umatilla County, 139 F.3d 690, 692 (9th Cir. 1998). Here, the jury had sufficient evidence to permit it to conclude that the officers engaged in wrongful conduct that a reasonable officer would have known was unlawful in light of clearly established law. See Act Up!/Portland v. Bagley, 988 F.2d 868, 871 (9th Cir. 1993); Anderson v. Creighton, 483 U.S. 635, 641 (1987).
 
 A. Illegal Stop
 
 20
 Officers are not entitled to qualified immunity for stopping a vehicle without probable cause or reasonable suspicion, especially when the stop includes detention and interrogation at gunpoint. Washington v. Lambert , 98 F.3d 1181, 1192-93 (9th Cir. 1996) (denying qualified immunity on similar grounds). The officers, however, claim they had probable cause to stop the vehicle on the basis of the traffic code violations -the defective taillight and seatbelt violations -as well as because they had a reasonable suspicion that the boys were engaged in criminal activity.
 
 1. Traffic code violations
 
 21
 The defendants claim that the officers legally stopped the plaintiffs' vehicle because of traffic code violations. However, at trial, the plaintiffs contended that the officers had fabricated the violations or only learned of them (e.g., the seatbelt violations) after the stop. The plaintiffs introduced sufficient evidence at trial to prove their claim. They also demonstrated significant inconsistencies in the officers' statements and the implausibility of some of the officers' explanations.
 
 
 22
 In terms of the defective rear light citation, the plaintiffs presented a witness who testified that the vehicle did not have any of the lighting problems that the officers claimed.[8] The plaintiffs also pointed to numerous problems with the officers' testimony. At the Juvenile Court hearing on the traffic citations, Officer Kramer testified that he and his partner returned to the gas station from their observation post across the street, followed the boys onto the street, and, from behind, saw the boys make a left turn onto Crenshaw, thus observing the inoperative left-turn signal. However, Kramer changed his story at trial and testified that the patrol car remained across the street and then pulled onto Crenshaw, at which time he noticed a burned out bulb in the taillight assembly.[9] Officer Kramer was impeached with his prior testimony.[10] Officer Kramer's explanation for the discrepancy: "That's what I testified to originally, sir, but I realized that I was wrong." Officer Kramer stated that he must have "made a mistake and confused this with another set of circumstances involving a traffic stop." At trial, when asked whether he was aware that Price was cited for a defective turn signal and not for a defective taillight, Officer Kramer replied he was not aware of that fact.
 
 
 23
 Officer D'Anjou testified that when he was first following the boys south on Crenshaw, he noted that one of the taillights --not a turn signal--was out. He admitted that, in performing his duties, he makes a distinction between a taillight and turn signal. He tried to explain that he had written the citation for an inoperative turn signal "because when it gets checked by the marshals or highway patrol, whoever they have it signed off with, they're going to look at that turn signal assembly to make sure the lights work."
 
 
 24
 The officers' testimony concerning the seatbelt violation was also troubled by inconsistencies and contradicted by the plaintiffs' testimony. At trial, the officers testified that they pulled the patrol car alongside Price's car to examine his facial reaction and to look inside the vehicle to see whether the occupants were wearing their seatbelts. However, the plaintiffs testified that the officers never pulled alongside their car. Even more damaging to the defendants, Officer D'Anjou had testified at his deposition that the patrol car never pulled alongside the boy's vehicle. At trial, the officers also claimed they could see that the boys were not wearing their seatbelts when the patrol car was initially following their vehicle from behind. The plaintiffs contended that this was simply not credible, given that the officers were two car lengths behind them and it was nighttime. The jury's judgment reflects that it believed the plaintiffs' explanation.
 
 
 25
 2. Reasonable suspicion of criminal activity
 
 
 26
 In the alternative, the defendants claim the stop was legal because a combination of factors provided them with reasonable suspicion of criminal activity. The defendants' arguments, however, substantially rely either on facts directly disputed by the plaintiffs' testimony or on factual allegations that were contradicted or undercut by their own testimony. As we discuss below, the remaining factors that the defendants cite, whether taken together or separately, are either improper or inadequate for purposes of establishing reasonable suspicion. "[A] showing of reasonable suspicion . . . is `a particularized and objective basis for suspecting the particular person stopped of criminal activity.' " United States v. JimenezMedina, 173 F.3d 752, 754 (9th. Cir. 1999) (quoting U.S. v. Cortez, 449 U.S. 411, 417 (1981)). Moreover, the entire theory that the officers stopped the car based on reasonable suspicion due to a number of related factors controverted their principal defense, namely, that they stopped the vehicle for a defective taillight and seatbelt violations. Hence, the jury could well have weighed these inconsistencies when evaluating the credibility of the defendants' rendition of events.
 
 
 27
 The defendants claim, for example, that one factor establishing reasonable suspicion was that the boys made a sudden turn into the gas station. However, the factual predicate underlying this claim was disputed during the trial. The officers' story was directly contradicted by the plaintiffs' testimony that Price made a slow and deliberate turn into the station so as not to elicit the officers' concern. The jury may well have believed the plaintiffs.
 
 
 28
 The defendants also claim that the boys' decision to pass up a Shell station before entering the Chevron station shortly afterwards provided a basis for reasonable suspicion. In the age of brand-names, however, there is nothing unusual, as Price explained at trial, in the fact that he preferred to shop at Chevron, instead of Shell. Furthermore, at trial, Officer D'Anjou admitted that, if the boys had actually turned into the first station, that might have been more suspicious. He conceded that turning into the first station might have appeared more evasive, because that would have terminated even more precipitously the officers' opportunity to observe whatever conduct the boys were engaged in.[11]
 
 
 29
 The officers claim that their suspicion of criminal activity was also based on the fact that the boys were driving five to ten miles below the speed limit. Not only does that speed not appear to be excessively slow, but the officers became aware of the boys' rate of travel only after the patrol car made a U-turn and then caught up with their vehicle. As the district court's interchange with Officer D'Anjou suggested, reasonable suspicion cannot be based on the fact that a car is traveling at a speed five to ten miles under the limit, even if the driver slows down to that speed once he notices a police car behind him.[12]
 
 
 30
 More surprisingly, at trial, the defendants also suggested that the fact the boys were not driving over the speed limit was a valid ground for suspecting criminal activity. We might understand that certain legal activity -perhaps driving far below the speed limit -may under some circumstances be cause for reasonable suspicion. However, we reject the argument that not driving in excess of the speed limit can constitute such cause. We would do so even if a driver were not aware that he was being followed by a police car. Moreover, we note that had the boys driven at a rate that exceeded the speed limit, the officers certainly could have cited that factor as a basis for a traffic stop. Thus, were we to accept the factor, we would probably have to conclude ultimately that all driving -over, at, or below the speed limit -is suspicious or subject to police stops.
 
 
 31
 The defendants also suggest, as additional factors for reasonable suspicion, that the three young men were traveling in a high crime area known for "gang activity." First, the district court, after determining that the defendants' potential testimony regarding gang activity was prejudicial and without foundation, precluded the introduction of such evidence. The defendants do not challenge that evidentiary ruling on appeal.
 
 
 32
 They, therefore, cannot rely on that factor now. Second, whether the location was a "high crime area" was disputed. At trial, the officers first stated the location the boys were driving through was such an area. Under direct examination, however, Officer D'Anjou admitted that it could not be called a "high crime area" relative to Los Angles County; that in fact it was a relatively low crime area in that regard. He explained, instead, that it was a "high crime area" for the City of Torrance. He also admitted that the boulevard along which the boys were traveling was a major thoroughfare. Under these circumstances, the jury could have reasonably concluded that the fact that the three young men were driving in an otherwise unsuspicious manner on Crenshaw Boulevard was not a factor that could give rise to reasonable suspicion. Cf . U. S. v. Mallides, 473 F.2d 859, 861 n.3 (9th Cir. 1973) ("That innocent activity occurs in a high crime area provides no basis for converting innocuous conduct into suspicious conduct.").
 
 
 33
 The remaining facts, relied on by the officers, are that the car in which the boys were driving was registered to a woman with an address outside the city limits of Torrance, and that after buying gas under the watchful eyes of the Torrance police department the three young men decided to head back home to Los Angeles. These facts, when considered with the other factors we have discussed, do not give police officers license to stop a vehicle. These are the kinds of purely innocent acts which, if made the basis for reasonable suspicion, would leave most any group of youths vulnerable to being stopped at the whim of the police. Surely, after hearing the testimony in this case, the jury could have reasonably concluded that the officers did not have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." Cortez, 449 U.S. at 417. "Unless there is `at least articulable and reasonable suspicion . . . that either the vehicle or its occupant is . . . subject to seizure for violation of law,' such a stop is unreasonable under the Fourth Amendment." United States v. Burt, 765 F.2d 1364, 1367 (9th Cir. 1985) (quoting Delaware v. Prouse, 440 U.S. 648, 663 (1979)).
 
 
 34
 We recognize that, in some circumstances, wholly innocent acts, when taken together, may give rise to reasonable suspicion. See United States v. Sokolow, 490 U.S. 1, 9 (1989) ("Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion."). In this case, however, the wholly innocent acts, when viewed cumulatively, give no more rise to reasonable suspicion than they do individually. Moreover, some of these "factors" may not be considered under any circumstance: for example, the fact that the vehicle was not exceeding the speed limit. In light of the above, a reasonable jury could readily have concluded that the officers' decision to stop the plaintiffs' vehicle did not meet the standard of reasonable suspicion.
 
 
 35
 Finally, the jury could have concluded that the officers stopped the boys' car on account of racial animus. As we discuss more fully below, the plaintiffs presented sufficient evidence at trial to support such a conclusion. The defendants do not contend that, if the allegations of racial bias are true, they should be entitled to qualified immunity.
 
 B. Warrantless search of vehicle
 
 36
 The defendants contend that two reasons justified the warrantless search of the vehicle without Price's consent: (1) a search of the car's equipment was justifiably related to the vehicle code violations; (2) a search for hidden weapons was justified by the possible threat to the officers' safety.[13] The first contention is easily resolved. As already explained, the plaintiffs argued that the officers fabricated the traffic code violations. The jury could have easily believed the search was therefore not based on any vehicle code offense, but, as the plaintiffs contended, on an unwarranted attempt to find something incriminating. Moreover, according to the plaintiffs' evidence, the search also proceeded to areas of Price's car -e.g., emptying a box of papers in the trunk of the car -that had no plausible connection to the vehicle code violations.
 
 
 37
 Relying on Michigan v. Long , 463 U.S. 1032 (1983), and Terry v. Ohio, 392 U.S. 1 (1968), the defendants also claim that they had the legal right to search the vehicle for weapons due to the existence of a potential threat to the officers' safety. The plaintiffs argue that the defendants waived this argument by not raising it before the district court, and the defendants make no response to that contention. The record reveals that the defendants did not make the argument before the district court. Rather, they argued that the search was lawful for an entirely different reason: they asserted that the search was conducted in order to look for contraband or evidence of a crime. In their closing argument, defense counsel explained: "What was this search about? Officer[sic] told you what this search was about; there was suspicious activity, they wanted to see if there were any tools of a crime in the car."[14] Moreover, the district court's jury instructions corresponded to the arguments the defense counsel made and thus did not include an explanation of the Michigan v. Long justification for a vehicle search for weapons. The defendants did not object to the jury instructions at trial nor do they try to challenge the instructions on appeal. Having failed to make the officer safety argument to the jury and having failed to object to the jury instructions, which offered an entirely different justification for the search, the defendants cannot raise the officer safety argument on appeal. Hawaiian Rock Prods. v. A.E. Lopez Ents., 74 F.3d 972, 976 (9th Cir. 1996).
 
 C. Excessive use of force
 
 38
 The plaintiffs' excessive use of force claim is easily resolved. The defendants do not contest the fact that, if the jury believed the boys' account of the physical abuse they suffered, the officers should be held liable for violating their Fourth Amendment rights. Regardless of any legal justification for a pat-down search, the police officers could not be justified in causing the boys extreme pain by deliberately grabbing, pulling, and squeezing their testicles. Graham v. Connor, 490 U.S. 386, 396-97 (1989). The plaintiffs provided the jury with sufficient evidence to support the conclusion that the officers had engaged in this conduct -conduct that clearly lies outside the protective realm of qualified immunity.[15]
 
 
 39
 * * *
 
 
 40
 A substantial part of the defendants' argument that they should have been entitled to qualified immunity depends on accepting their version of events and rejecting the plaintiffs' testimony and other contrary evidence. The plain fact is that the plaintiffs presented the jury with sufficient evidence to justify the conclusion that the defendants' actions were such that no reasonable officer would have considered the conduct lawful in light of clearly established law. The jury had the right to accept the plaintiffs' testimony and reject the defendants'. Indeed, the district court would have committed reversible error if it had granted the defendants qualified immunity as a matter of law.
 
 III. Racial Bias
 
 41
 The defendants also contend that the jury was unfairly prejudiced, because the plaintiffs "deliberately dragged the highly emotional specter of racism into the case." The defendants object both to the adequacy of the notice that racial bias would be put in issue and to the prejudicial nature of the evidence introduced. In terms of timing, the defense was given more than two years advance warning before the first day of trial. On February 24, 1995, the plaintiff's Second Amended Complaint included racial bias as one of the claims. On February 5, 1996, the Pretrial Conference Order specifically incorporated the Second Amended Complaint and included language regarding callous and malicious conduct that encompassed the issue of racial bias. Four days later, the district court's Pretrial Order on the "Defendants' Motions in Limine" squarely rejected the defendants' argument that racial bias had been entered too late. See Miller v. Safeco Title Insurance Co., 758 F.2d 364, 368 (9th Cir. 1985) (permitting admission of issues "embraced within . . . language" of pretrial order and subsequently approved by the district court). We have stated that "[l]eave to amend is generally within the discretion of the district court." Nelson v. Pima Community College, 83 F.3d 1075, 1079 (9th Cir. 1996)."In exercising this discretion, a court must be guided by the underlying purpose of [Federal Rules of Civil Procedure] Rule 15 to facilitate decision on the merits, rather than on the pleadings or technicalities. Accordingly, Rule 15's policy of favoring amendments to pleadings should be applied with `extreme liberality.' " Eldridge v. Block, 832 F.2d 1132, 1135 (9th Cir. 1987) (citations omitted). Even without this liberal application of Rule 15, the defendants' argument fails. The defendants cannot reasonably claim that they were "substantially prejudice[d]" by the timing of the amended pleadings. Consol. Data Terminals v. Applied Digital Data Sys., 708 F.2d 385, 396 (9th Cir. 1983); Duggan v. Hobbs, 99 F.3d 307, 313 (9th Cir. 1996). They had more than two years advance notice, and, from the record, there is no reason to believe that they were unprepared to defend against the allegation of racial bias.
 
 
 42
 The defendants' arguments that the evidence regarding racial bias was unfairly prejudicial are rather surprising because they themselves were the first to elicit testimony regarding the issue of racism. During direct examination of Mason, the first plaintiff to take the stand, race was not mentioned. Early into cross-examination, however, the defense counsel asked Mason: "Isn't it true that its part of your problem that you didn't believe these police officers actually had a reason to pull you over, other than to give you a hard time" and "that's part of what causes your anger and emotional problems." Mason replied, "Not particularly. That's something that has been with me my whole life, it's an unfortunate thing that young black people have to accept as part of their life." Defense counsel did not object to this answer or seek to have it struck as non-responsive. Astonishingly, the defendants' brief quotes this passage to exemplify what it considered objectionable instances of "injecting allegations of racial bias into a trial," even though it was the defense counsel who asked Mason the question and accepted the answer. Later in the cross-examination of Mason, defense counsel also asked: "And isn't it true that at this point when you were at the gas station . . . and they were circling around you and looking that you had already believed that your race may have something to do with this?" Mason predictably responded,"Yes."[16] It should be no surprise that "Appellants may not seek reversal on the basis of their own evidentiary errors." United States v. Miller, 771 F.2d 1219, 1234 (9th Cir. 1985).
 
 
 43
 Later in the trial, Mason's mother and Price's mother took the stand and the plaintiffs' counsel asked them related questions. The attorney introduced these questions by asking Mrs. Mason about the "topic touched upon by your son in his testimony." The attorney asked Mrs. Mason whether she instructed her son about actions he should take if he were followed or stopped by the police. Mrs. Mason testified that she and her husband told their son that "when he is being watched or followed to simply continue doing what he is doing, that he can't prevent them from doing that necessarily, but that he should at all times be respectful and follow their instructions." The plaintiffs' counsel then asked Mrs. Mason "why have you and your husband instructed your son in this subject[of what to do if followed or stopped by police officers]? " Mrs. Mason replied, "it is my both belief and experience that young males, and in particular in our culture young black males are stopped frequently . . . My sons, both of them, have been stopped frequently, sometimes for violations, sometimes not." Lohren Price's mother testified similarly: "I told [Lohren] that as an African-American he is targeted, that he will be stopped by the police, but when he is stopped by the police he is to be cooperative, polite . . ." The questions and answers were important, including the statements about race made by Daniel Mason in response to defense counsel's questions, because they helped to explain the boys' state of mind at the time of the incident, and why they responded the way they did. The exchanges served to make the boys' answers more credible and to counter the defendants' contention that, if the youths were truly subject to excessive force or other abuse, they would have been more agitated or have complained to the officers.
 
 
 44
 Regardless of who first introduced the issue, racial bias was an obvious and appropriate subject to explore given the nature of the case. In closing arguments, it was appropriate for the plaintiffs' counsel to tell the jury it could infer racial bias from all of the circumstances. The first such circumstance was the fact that when the officers first decided to make a U-turn and follow the plaintiffs' car, all they had seen were two young African American males driving down a major boulevard in an unremarkable manner. The next circumstance it was appropriate to ask the jury to consider was the questions directed by Officer Kramer to the white teen, Nicholas Cramer. The officer asked Cramer whether he knew the two black teens, whether they were actually his friends, and how long he had known them. No comparable questions were asked of the black plaintiffs. Instead, Kramer asked Price and Mason, the two African American teens "What are you doing out here?" The officer also told Mason "You're not supposed to be here." In leaving, the officers' last words to the boys were, "Get the hell out of here." The plaintiffs' counsel appropriately introduced testimony to prove these facts and, on that basis, appropriately urged the jury to draw the inference that the officers had acted on racial bias.
 
 
 45
 The relevance of the subject of racial bias is readily apparent, for several reasons. First, proving the officers' actions were racially motivated could explain why they stopped the boys' vehicle without probable cause or reasonable suspicion and also why they used excessive force without cause. Establishing the officers' racial motivation tends to demonstrate why the plaintiffs' testimony, and not the officers', should be deemed credible by the jurors. That is, it explains why the officers might have lied about the events in question. Finally, racial bias was important to proving the defendants conduct was "malicious, wanton or oppressive or in reckless disregard of the plaintiffs' rights" which, according to the jury instructions, was necessary to the receipt of punitive damages. The defendants' argument that race was introduced into this case improperly is without merit.
 
 IV. Evidentiary objections
 
 46
 The defendants contend that the district court made two erroneous evidentiary rulings. First, the defendants argue that the court erroneously precluded the introduction of evidence on the issue of excessive force. Specifically, as a brief aside in the midst of other arguments, the defendants' brief contends that the district court erroneously prevented Officer Kramer from physically demonstrating to the jury his technique for pat-down searches. The defendants, however, do not argue that the district court's ruling was prejudicial, nor could they persuasively make such a claim. Officer Kramer was allowed, on two occasions, to describe, in graphic detail, his method of conducting a pat-down search. The district court's decision to limit his testimony to a verbal description of his technique rather than also permitting him to give a physical demonstration is not reversible error; in fact, it is not error at all. It is highly doubtful that the officer's demonstration would have added anything, and the defense never explained how it might have. The court's ruling was not an abuse of discretion and could not possibly have affected the outcome of the proceedings.
 
 
 47
 Second, the defendants argue that certain statements by some of the witnesses constituted "lay opinion testimony" in violation of Rule 701 of the Federal Rules of Evidence. However, the defendants never objected to the testimony on the basis they now seek to raise. Specifically, they did not ask the district court to preclude the testimony in question as lay opinion testimony.[17] Accordingly, the defendants' argument is waived. Marbled Murrelet v. Babbit, 83 F.3d 1060, 1066 (9th Cir. 1996) ("By failing to object to evidence at trial and request a ruling on such an objection, a party waives the right to raise admissibility issues on appeal."); Fenton v. Freedman, 748 F.2d 1358, 1360 (9th Cir. 1984).[18]
 
 
 48
 V. The district court's conduct of the trial
 
 
 49
 The defendants contend that the district court conveyed to the jury that it did not believe their testimony and that it held an unfavorable view of them. On this basis, the defendants argue they were denied a fair trial and the jury's verdict should be reversed. Federal judges are granted broad discretion in supervising trials, and a judge's behavior during trial justifies reversal only if he abuses that discretion. United States v. Greene, 698 F.2d 1364, 1375 (9th Cir. 1983). A judge's participation during trial warrants reversal "only if the record shows actual bias or leaves an abiding impression that the jury perceived an appearance of advocacy or partiality." United States v. Laurins, 857 F.2d 529, 537 (9th Cir. 1988); United States v. Scholl, 166 F.3d 964, 977 (9th Cir. 1999). The record here, however, clearly shows that the defendants' allegations are without foundation.
 
 
 50
 The appellants primarily focus on two allegations of judicial impropriety. First, they contend that the district court improperly stated in open court that no evidence existed to show the officers had permission to search the car. This was erroneous because Officer Kramer had previously testified that it was his habit and custom to ask individuals for permission to search their vehicles. The district court's comments, however, were insignificant and any adverse effect was effectively cured by the court's subsequent instruction. The statement in question was a short but confusing comment the court made in the course of precluding a line of questioning that called for a legal conclusion. Recognizing the potential concern, the district court issued a prompt and effective curative instruction. See Laurins, 857 F.2d at 538 (noting that curative instruction can alleviate potential perception of judicial bias). The appellants mischaracterize the court's curative instruction by claiming it still "conveyed the impression that the judge did not believe that the habit evidence was sufficient." On the contrary, the curative instruction explained, at length, the importance and potential sufficiency of the habit and custom evidence in proving consent to the search. The court acted in a neutral and appropriate manner by clarifying its earlier statement and by leaving the sufficiency determination open to the jury.
 
 
 51
 Second, the defendants contend that the district court inappropriately prevented defense counsel from asking a plaintiff why he chose to enter one gas station instead of another. However, defense counsel had already asked that question and received the same answer a number of times. The district court was acting well within its discretion to "prevent undue repetition of testimony." United States v. Mostella, 802 F.2d 358, 361 (9th Cir. 1986). The defendants misrepresent the record by claiming that the court's comments conveyed the impression that the choice of gas stations "was of no importance." First, the court's comments were clearly meant to prevent repetition, not to minimize the potential relevance of the question. Second, the defendants ignore the court's subsequent statement to the jury: "Out of an excess of caution, nobody heard me saying, I hope, that you should or should not be interested in that question . . . I hope nobody heard me saying that the question shouldn't be considered interesting, I wasn't saying that, or that it was; I was just wondering if further elucidation of the question was going to help anyone." These instructions cured any impression of partiality which might have been produced by the court's previous ruling.
 
 
 52
 The defendants' remaining allegations of impropriety also do not show "actual bias or leave[ ] an abiding impression that the jury perceived an appearance of advocacy or partiality." Laurins, 857 F.2d at 537; United States v. DeLuca, 692 F.2d 1277, 1282 (9th Cir. 1982). For example, the defendants object to actions the district court took simply to clarify the relevance of a line of questioning; to determine whether the defense counsel had successfully interrupted the part of a witness's testimony that the counsel found objectionable; and to clarify whether one of the officers was testifying that he "asked" or that he "told" the plaintiffs to follow his directions during the stop. These interventions are appropriately part of the judge's role as "more than a moderator or umpire. It is entirely proper for him to participate in the examination of witnesses for the purpose of clarifying the evidence, confining counsel to evidentiary rulings, controlling the orderly presentation of the evidence, and preventing undue repetition of testimony." United States v. Mostella, 802 F.2d 358, 361 (9th Cir. 1986) (citations omitted); Laurins, 857 F.2d at 537.
 
 
 53
 In terms of abiding impressions, the defendants also ignore instances in which the district court clearly assisted their side. For example, the district court walked witnesses through testimony in favor of crucial aspects of the defense's case. Specifically, the court helped the defense counsel establish the best possible explanation for the officers' confusion about whether the vehicle had a defective taillight or a defective turn signal. The court also made comments suggesting it believed the explanation.
 
 
 54
 Finally, the defendants base their assertion that the district court was actually biased on a statement made by the court during the post-trial evidentiary hearing. The statement, far from indicating bias, simply conveyed the court's evaluation of which side had the better case. The court, in fact, made this statement, in part, to inform the defense counsel of the hazards of seeking a new trial in which they might not only lose again but also potentially face renewed Monell claims. The court also commented on its appreciation of the strength of the plaintiffs' case in the course of evaluating the basis of the jury's verdict and whether prejudice potentially resulted from alleged jury misconduct. Other comments by the court, if anything, suggest bias against the plaintiffs. The court called the plaintiffs' lawyer "greedy" and said that if he was a good lawyer he would have--should have--accepted a settlement. The court also criticized individuals on the plaintiffs' side for supporting punitive damages in the case when they otherwise fail to do so in their public life. When the jury was in recess, the court also said, "if [this case is] based on an outright lie on the plaintiff's side, somebody on the plaintiff's side belongs in jail." Then, in referring to the two officers, the court stated. "I say again, my presumption is that both of the two people I'm looking to at my left are guys that I would have liked to have known and been pleased to have them as friends, it may still be true." The record does not suggest actual bias nor does it suggest the district court did anything but conduct a fair and impartial trial.
 
 VI. Juror Misconduct
 
 55
 The defendants contend that the jury verdict should be overturned because of the bias of two jurors and the jury's consideration of extraneous evidence. The defendants raised these arguments below and the district court held a post-trial evidentiary hearing to evaluate the claims. Defendants argue that the scope and nature of that hearing was inappropriate. However, "[t]he district court has the discretion to determine the extent and nature of the hearing." Hard v. Burlington Northern Railroad, 812 F.2d 482, 485 (9th Cir. 1986). The hearing in this case was reasonably calculated to resolve the doubts raised about the allegations of juror misconduct, and the process ensured that all parties were fairly represented. Dyer v. Calderon, 151 F.3d 970, 974 75 (9th Cir. 1998) (en banc). The district court held that the allegations did not merit reversal, and we agree.
 
 A. Juror Bias
 
 56
 Defendants contend that two of the jurors, Glenn Eggert and John Wilhite, engaged in juror misconduct by purposefully withholding information during voir dire indicating bias. We evaluate such claims of juror misconduct according to a two-part test: (1) whether "a juror failed to answer honestly a material question on voir dire;" and (2) whether "a correct answer would have provided a valid basis for a challenge for cause." McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984).
 
 
 57
 With regard to juror Eggert, the district court made specific findings that his omission was an honest mistake and a relatively insignificant one at that. In voir dire, Eggert described a negative experience he had had with a police officer when he was a teenager. After the trial, the defense counsel learned that Eggert did not mention the fact that physical contact occurred, involving the officer backing Eggert up against a vehicle. The district court accepted Eggert's omission as an honest mistake. In the post-trial evidentiary hearing, Eggert explained that he omitted that fact because he did not think it was an important part of the story--he could not even recall whether he had told the other jurors about this aspect of the incident. Eggert also explained that he was trying to be brief in his response to the voir dire questions and would have given further descriptions of the incident if asked. The district court found Eggert credible and held that his failure to disclose this aspect of the incident was an honest mistake. We see no reason to conclude otherwise.
 
 
 58
 The district court also found that the omitted information did not indicate partiality. The defendants suggest that Eggert, at the post-trial evidentiary hearing, acknowledged he was biased against the police. However, Eggert's testimony was consistent with the statement he gave during voir dire: at the time of the incident, he thought he had been mistreated by the police officer, but due to the benefit of age and hindsight he had since recognized the officer was only doing his duty. If anything, Eggert's testimony reflects bias in favor of the defendants. It suggests Eggert was likely to think a youth might misperceive a police officer's actions as abusive, while maturity and more sober reflection would show the officer was only performing his duty.
 
 
 59
 With regard to juror Wilhite, the district court found that he omitted two pieces of information, but that, as in Eggert's case, neither omission indicated dishonesty or bias. During voir dire, Wilhite failed to mention, first, that his half-brother was a police officer and, second, that he had participated in a ride-along approximately fourteen years earlier in which he had witnessed improper police conduct. The district court, after examining Wilhite directly and allowing him to be questioned by opposing counsel, concluded that these omissions constituted an innocent oversight. We have no cause to reverse the district court's decision. Wilhite had been long estranged from his half-brother, and the court made a substantial inquiry before finally concluding that Wilhite honestly forgot to mention the relationship. Also, as the district court found, it was understandable that Wilhite had simply forgotten about the ride-along which occurred approximately fourteen years earlier, when he was fifteen or sixteen years old. See Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998) (en banc) ("[W]e must be tolerant, as jurors may forget incidents long buried in their minds . . . . [A]n honest yet mistaken answer to a voir dire question rarely amounts to a constitutional violation." ) (citing McDonough Power , 464 U.S. at 555-56). In any case, it appears that a correct answer would not have provided grounds for a challenge for cause. The district court did not commit clear error in finding that these omissions were honestly made. Accordingly, the court did not abuse its discretion in rejecting the charges of juror bias.[19]
 
 B. Extraneous evidence
 
 60
 The defendants argue that they were denied a fair trial because the jury was exposed to extraneous evidence. They contend that Eggert and Wilhite's telling the other jurors about their own experiences with the police constituted improper extraneous evidence. We disagree. We have recognized that "[j]urors must rely on their past personal experiences when hearing a trial and deliberating on a verdict." Hard v. Burlington Northern Railroad, 812 F.2d 482, 486 (9th Cir. 1986). The two jurors' past personal experiences were of a general nature, and involved only minor incidents that could not have prejudice the jury or influenced its decision. The district court acted within its discretion by ruling that the discussion of those experiences should not be considered improper extrinsic evidence.
 
 
 61
 Defendants also argue that juror Vivian Justis's commentary on the handwriting of one of the officers constituted extraneous information. On first seeing the traffic citation, Justis remarked, "it looks like the writing of a deviate sociopath," a statement that defendants now characterize as "conduct[ing] a handwriting analysis of the Officer's citation." First, the juror's off-the-cuff statement does not even resemble the type of "extraneous information" this court proscribes. See, e.g., United States v. Navarro-Garcia, 926 F.2d 818 (9th Cir. 1991) (juror conducts out-of-court experiment to duplicate weight of drugs found in defendant's vehicle); Marino v. Vasquez, 812 F.2d 499 (9th Cir. 1987) (juror conducts out-of-court experiment with third party involving firing and positioning of handgun). Justis did not hold herself out as an expert, claim any special knowledge, or engage in empirical or experimental analysis. Even if we assumed Justis's remarks constituted "extraneous information," we would not conclude that a direct and rational connection exists between the information she presented and the jury's conclusion. Jeffries v. Blodgett, 5 F.3d 1180, 1190 (9th Cir. 1993); Navarro-Garcia, 926 F.2d at 822-23. In reaching this determination, we accord special deference to the district court's analysis of the potential impact of such material on the jury. United States v. Plunk, 153 F.3d 1011, 1024 (9th Cir. 1998). Juror Wilhite responded to Justis by establishing that she had identified the wrong handwriting. He successfully discredited and embarrassed her in front of the other jurors. The district court was correct to conclude that juror Wilhite's response to Justis's statement "neutralized the effect" of her remark. Given the context and scope of the so-called hand-writing analysis, the district court did not abuse its discretion by refusing to grant a motion for a retrial on the basis of Justis's remarks.
 
 
 62
 VII. Abandoned claims against the city and the chief of police
 
 
 63
 Both parties agree that the plaintiffs abandoned their claims against the City of Torrance and its Chief of Police Joseph Deladurantey. There is also no dispute between the parties that judgment should correspondingly be entered for these two defendants. During trial, the district court dismissed the Chief of Police from the case after the plaintiffs decided not to introduce evidence against him. The plaintiffs expressly consented to the court's order dismissing him as a defendant. The plaintiffs also explicitly told the district court that they had abandoned their claims against the City of Torrance. The district court, however, did not enter judgment on behalf of either of these two defendants. Without explanation, the district court also denied these defendants' motion for modification of the final order to reflect judgment in their favor. We reverse the district court's failure to enter judgment for the City of Torrance and the Chief of Police and direct that an appropriate order be entered upon remand.
 
 CONCLUSION
 
 64
 The police officers in this case appear to have chosen the wrong young people. Two African American teens and a white teen were innocently driving through the City of Torrance, happily and quietly celebrating their graduation from prep school. For no good reason, two police officers stopped their car without probable cause or reasonable suspicion, conducted an illegal search of the vehicle, and used degrading and excessive force on the young boys. Such is not an isolated incident in the Greater Los Angeles area, or across the country. See, e.g., Washington v. Lambert , 98 F.3d 1181, 1187-88 (9th Cir. 1996) (discussing studies documenting traffic stops and police harassment of African American and Hispanic males). This time, however, the youngsters had the wherewithal and families with the legal knowledge and economic resources to seek justice for the wrongs committed. The defendants received a fair and impartial trial. In recognition of the officers' wrongdoing, the jury awarded the plaintiffs not only compensatory but also punitive damages. The defendants have given us no reason to doubt the correctness of the jury's determination.
 
 
 65
 The plaintiffs did, however, decide to abandon their claims against the City of Torrance and its Chief of Police. The district court's final order should have reflected judgment in favor of these two defendants. We remand the case for the limited purpose of allowing the district court to enter judgment in favor of the City of Torrance and the Chief of Police in accordance with this opinion. In all other respects the verdict stands.
 
 
 66
 AFFIRMED in part, REVERSED and REMANDED in part.
 
 
 
 Notes:
 
 
 [1]
 Officer Kramer testified that Officer D'Anjou, who was driving, made the U-turn without explaining to Kramer his reason for doing so, and Kramer did not ask for a reason. Officer D'Anjou testified that he did not recall making the U-turn. He did recall speeding up to follow the vehicle, and explained his reason for doing so was that "it was the only car on the street."
 
 
 [2]
 At this point, the officers ran a check on Price's license plate. The officers testified that the check came back and that the car was registered to "a woman from an area other than Torrance." The "woman" was Price's mother, Marilyn Price. The car was registered to Marilyn Price at the family's address in Los Angeles, which was the same address shown on Price's driver's license. Officer Kramer testified that he did not know where this address was located, only that it was in Los Angeles and not in Torrance.
 
 
 [3]
 The citations for these alleged traffic violations were all subsequently dismissed by the Juvenile Court.
 
 
 [4]
 Because after hearing all the testimony from both sides, the jury awarded the plaintiffs a verdict in the amount of $245,000, including punitive damages, we set forth the version of the facts upon which the plaintiffs sought relief, and which support the jury's verdict. Our review of the record gives us no reason to doubt the truthfulness of the plaintiffs' assertions or the correctness of the verdict in their favor.
 
 
 [5]
 Lama v. Borras, 16 F.3d 473, 476 n. 5 (1st Cir. 1994); Pahuta v. Massey-Ferguson, 170 F.3d 125, 130 (2d Cir. 1999); Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp., 51 F.3d 1229, 1237 (4th Cir. 1995); Black v. J.I. Case Co., 22 F.3d 568, 570-71 (5th Cir. 1994); Jarrett v. Epperly, 896 F.2d 1013, 1016 (6th Cir. 1990); Watson v. Amedco Steel, Inc., 29 F.3d 274, 277 (7th Cir. 1994); Metropolitan Life Ins. Co. v. Golden Triangle, 121 F.3d 351, 354 (8th Cir. 1997); Whalen v. Unit Rig, Inc., 974 F.2d 1248, 1250-51 (10th Cir. 1992); Glaros v. H.H. Robertson Co., 797 F.2d 1564, 1569 (Fed.Cir. 1986).
 
 
 [6]
 In Behrens v. Pelletier , 516 U.S. 299, 313 (1996) the Supreme Court identified the denial of a motion for qualified immunity as a matter of law as one of only a "small class" of district court decisions which, under Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546 (1949), are immediately appealable. Behrens, 516 U.S. at 305. The fact that a pre-trial ruling denying qualified immunity is in the Cohen category of cases supports the conclusion that such a ruling is not appealable after final judgment. In Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc., 506 U.S. 139 (1993), the Court explained that, for a decision to fit within the Cohen class of cases, it must be "effectively unreviewable on appeal from a final judgment." Puerto Rico Aqueduct, 506 U.S. at 144-45; see also Coopers & Lybrand v. Livesay, 437 U.S. 463, 468 (1978).
 
 
 [7]
 Because we are reluctant to leave the impression that defense counsel may have forfeited important rights of their clients by their inaction, we note that our review of the record reveals that the defendants would not have prevailed had a timely interlocutory appeal been taken. At the least, there was a genuine issue of fact as to the relevant issues.
 
 
 [8]
 Price's uncle, who was a master mechanic and regularly worked on the car, testified at trial. He had inspected the vehicle before and after the incident and testified that it had none of the defects -whether an inoperative turn signal or a defective taillight -that the officers described.
 
 
 [9]
 During the Juvenile Court hearing, it was important, if not crucial, that Officer Kramer testify that he observed a left turn from behind the vehicle, because the citation was for an inoperative left-turn signal. In the district court proceedings, the officers changed their story claiming they observed a burned out taillight. This explanation was more conducive to their position because it meant the officers could have observed the lighting defect simply by traveling behind the car. The citation, however, was clearly for an inoperative left-turn signal. That defect could not have been observed had the police car been located where Kramer testified it was in his district court testimony.
 
 
 [10]
 Among other things, Officer Kramer also made inconsistent statements regarding his and his partner's actions when the boys initially entered the gas station. At trial, he stated that the patrol car had first followed the Chevrolet directly into the gas station to verify the car's license plate. Earlier, however, in the Juvenile Court proceedings, he had testified that the patrol car first parked in the lot across the street, rather than following the boys into the gas station.
 
 
 [11]
 The officers also claimed that they found it suspicious that the boys had already passed a Thrifty gas station which was located significantly up Crenshaw Boulevard. Under direct examination, however, the officers conceded that they had no way of knowing whether the boys had entered onto Crenshaw Boulevard prior to the Thrifty station and thus whether they even had the opportunity to consider that "fact."
 
 
 [12]
 Another factor the defendants improperly cite as a basis for reasonable suspicion is the fact that once the officers began to follow the boys' vehicle, "the passenger, Cramer, look[ed] back at them." Again, this type of reaction does not constitute a basis for suspicion of criminal wrongdoing. Rather, it reflects a normal response that any driver or passenger might have when a police car does a U-turn and then begins to follow him. See Washington v. Lambert, 98 F.3d 1181, 1191 (9th Cir. 1996) (The fact that an individual "looked at [police officer] and looked away a few times inside a restaurant did not make it more likely that[he] was a criminal . . . . It is also a fact that many innocent black men, and even many innocent white men, will appear nervous when they notice that they are being followed by the police . . . ." ).
 
 
 [13]
 The defendants also claim that Price gave his consent for the vehicle to be searched. However, the plaintiffs' testimony directly refuted that allegation, and the jury could have easily found the plaintiffs' account more credible.
 
 
 [14]
 Notably, neither Long nor Terry supports a search for evidence of a crime: "Nothing in Terry can be understood to allow . . . any search whatever for anything but weapons." Ybarra v. Illinois, 444 U.S. 85, 93-94 (1979); Minnesota v. Dickerson, 508 U.S. 366, 373 (1993) ("If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under Terry"); Adams v. Williams, 407 U.S. 143, 145 (1972) ("The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence."); Long, 463 U.S. at 1052 n.16.
 
 
 [15]
 The officers raise one evidentiary issue related to the excessive force claim. As a brief aside in the midst of other arguments, the defendants' brief contends that the district court erroneously prevented Officer Kramer from physically demonstrating to the jury his technique for pat-down searches. The defendants, however, do not argue that the district court's ruling was prejudicial, nor could they persuasively make such a claim. Officer Kramer was allowed, on two occasions, to describe, in graphic detail, his method of conducting a pat-down search. The district court's decision to limit his testimony to a verbal description of his technique rather than also permitting him to give a physical demonstration is not a reversible error; in fact, it is not error at all. It is highly doubtful that the officer's demonstration would have added anything, and the defense never explained how it might have. The court's ruling was not an abuse of discretion and could not have possibly affected the outcome of the proceedings.
 
 
 [16]
 Given the record, we fail to understand the claim the defendants make in their reply brief, namely, that "Defendants' counsel did not ask Plaintiffs any question related to race."
 
 
 [17]
 Admittedly, defense counsel objected to testimony by Cramer and his father, but this was on the ground of lack of relevance, not on the basis of it being improper lay opinion testimony. The fact that the defendants made the other evidentiary objection at trial does not preserve the objection they failed to make.
 
 
 [18]
 Even if the argument had not been waived and the admission of the evidence was erroneous, we would not consider this a reversible error, because it was not prejudicial. Given the strength of the plaintiffs' case and the numerous problems with the officers' testimony, the admission of this testimony did not affect the outcome of the proceedings.
 
 
 [19]
 The defendants also suggest that Wilhite and Eggert's bias should be presumed under the doctrine set forth in Dyer v. Calderon, 151 F.3d 970, 974 (9th Cir. 1998). However, "[o]nly in`extreme' or `extraordinary' cases should bias be presumed. Tinsley v. Borg , 895 F.2d 520, (9th Cir 1990) (citation omitted); Dyer, 151 F.3d at 974-75. It is a far stretch to claim this case presents such an exceptional circumstance. Smith v. Phillips, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring) (providing examples of situations where bias may be presumed such as "a revelation that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction."). Neither Wilhite nor Eggert "present a relationship in which the `potential for substantial emotional involvement, adversely affecting impartiality' is inherent." Tinsley, 895 F.2d at 527 (citation omitted).