NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No. CC-18-1227-SFL |
| WENDY TEJEDA, | Bk. No. 2:17-bk-10155 |
| Debtor. | Adv. No. 2:17-ap-01308 |
| WENDY TEJEDA, | |
| Appellant, | |
| v. | MEMORANDUM* |
| SORAYDA VELASQUEZ, | |
| Appellee. | |

Argued and Submitted on February 21, 2019
at Pasadena, California

Filed – March 12, 2019

Appeal from the United States Bankruptcy Court
for the Central District of California

---

\* This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value. *See* 9th Cir. BAP Rule 8024-1.

Honorable Ernest M. Robles, Bankruptcy Judge, Presiding

---

Appearances:   Metu C. Ogike argued for appellant; Paul J Estuar of
Legal Aid Foundation of Los Angeles argued for appellee.

---

Before: SPRAKER, FARIS, and LAFFERTY, Bankruptcy Judges.

## INTRODUCTION

Prior to her chapter 7[1] bankruptcy filing, debtor Wendy Tejeda was Sorayda Velasquez's landlord. The landlord-tenant relationship ended badly. Velasquez and her three minor children lived in the apartment for roughly three years; however, during the last nine months they lived there, the apartment had no running water. Eventually, Velasquez and her children vacated the premises. After Tejeda commenced her bankruptcy case, Velasquez filed a nondischargeability complaint under § 523(a)(6) alleging that, in order to induce Velasquez to move, Tejeda had refused to reconnect water service to the apartment after the water company had shut it off.

After a one-day bench trial, the bankruptcy court determined that the

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

harm Velasquez and her children suffered while living in the apartment without water constituted willful and malicious injury within the meaning of § 523(a)(6).

Tejeda appeals from the nondischargeability judgment. She makes several different arguments on appeal, but her arguments were not raised in the bankruptcy court, lack merit, or both. Accordingly, we AFFIRM.

## FACTS

Tejeda owned a five-unit apartment complex in Los Angeles, California. In September 2012, Tejeda leased to Velasquez a two-bedroom apartment in the complex on a month-to-month basis.[2] As part of the lease, Tejeda agreed to provide Velasquez's utilities, including water, gas and electricity. This made sense because multiple units, including Velasquez's, were connected to a single water meter and a single electric meter.[3]

According to Tejeda, Velasquez was supposed to pay monthly rent of $1,100, and that amount never changed. Tejeda further insists that Velasquez stopped paying rent in August 2012 (actually before Velasquez

---

[2] The parties disagree as to whether the lease was oral or written. Regardless, there appears to be no dispute that Tejeda leased the apartment to Velasquez on a month-to-month basis and that utilities were included in the lease. The bankruptcy court found the lease to be oral. This finding is not challenged on appeal. Nor are the basic lease terms referenced above.

[3] Velasquez did not testify regarding whether there were multiple gas meters or a single gas meter for the complex. When Tejeda was asked that question, she stated that she did not know.

says she moved in) and that she never paid any rent afterwards. She claims that all of the tenants in the complex, acting "in cahoots," stopped paying rent at the same time. She posits that they all felt free to ignore their rent payment obligations at that point because her husband had left her and was no longer collecting the rent for her.

Velasquez tells a much different story regarding rent. She maintains that things went well with her apartment for roughly a year. She duly paid $975 rent in cash, in person, to Tejeda or her husband. Then, after about a year, she came home one night, and there was no electricity in her apartment. She contacted Tejeda, who told her that she had disconnected the electrical service because one of the other tenants was not paying rent. Tejeda declined to take any steps to reconnect the electrical service. Instead, she told Velasquez that, if she was unhappy, she should move. Velasquez was forced to open an electrical service account in her own name. This was particularly problematic because of the shared electric meter. As a result, Velasquez was forced to pay for electric consumption for herself and for several other tenants in the complex. According to Velasquez, Tejeda granted her a $100 per month rent reduction – from $975 to $875. Unfortunately, this reduction did not cover the increased cost of paying the electric bill covering several tenants, and she was too afraid to ask the other tenants to share the cost.

A few months after the electrical service interruption, the gas to

Velasquez's apartment was turned off. Once again, Velasquez called Tejeda seeking to have the gas service resumed. Again, Tejeda declined to take any steps to resume the gas service. Instead, Tejeda advised Velasquez that she should put the gas service account in her own name, like she had done with the electrical service account. Tejeda again told Velasquez to move if she did not like this. Unlike with the electrical service adjustment, there was no agreed-upon reduction in the amount of Velasquez's monthly rent after she took over the gas service account.[4]

According to Velasquez, she continued to pay rent to Tejeda until the water service to her apartment was turned off in December 2014. As Velasquez tells it, she learned from one of the public assistance organizations she contacted at the time that she was not obliged to pay any rent so long as no running water was available in her apartment. On the other hand, Velasquez insists that she was ready, willing and able to resume making her rent payments as soon as the water service to her apartment resumed. She said she told Tejeda this. In response, however, Velasquez says that Tejeda indicated she had no intention of restoring the

---

[4] Neither party produced any documentary evidence to support their respective claims regarding rent. The written lease presented into evidence did not help pin down the amount of rent Velasquez was supposed to pay. Both parties acknowledged that the amount of rent specified in the written lease – $653 – did not reflect the amount of monthly rent Velasquez actually owed. Instead, the $653 was the maximum amount of rent Velasquez could agree to pay and still qualify for a one-time public assistance benefit payment of $653. Apparently, Velasquez and Tejeda initially worked together to fabricate a false lease agreement to help Velasquez qualify for the benefit payment.

water service. Instead, Tejeda told Velasquez that she did not want the apartment complex anymore and that she wanted all of the tenants to leave. When Velasquez told Tejeda she needed to restore the water service, Tejeda supposedly refused and told Velasquez: "No, Sorayda [Velasquez], I have been telling you for a time to go find some other place to live. I don't know why you keep insisting on staying if you know what's going on there . . . ." Tejeda also supposedly told Velasquez: "If you don't feel good there, I've been telling you for a while that it's better that you leave." Tejeda denies ever having told Velasquez that she should move and denies having shut off the water to force tenants to move.[5]

One of the public assistance agencies Velasquez contacted, Strategic Actions for a Just Economy (aka SAJE), notified the Los Angeles County

---

[5] It is worth mentioning that Tejeda ceased paying for water to the complex in February 2013, long before water service was disconnected in December 2014. Between those two dates, other tenants assumed responsibility for the water service account. Something changed around December 2014 that caused the water utility, Golden State Water Company, to disconnect the water supply. Two reasons were posited at trial: (1) the water service account in the name of one of the other tenants had a $6,000 balance due; and (2) someone allegedly had tampered with the water meter. Whatever the reason, Velasquez testified that Golden State refused to permit her to transfer the water service account into her name, apparently telling her that only the owner could do so. Tejeda testified that she spoke with Golden State and that she also tried to reconnect the water service but that Golden State refused unless she paid the outstanding $6,000 water bill. Tejeda testified that she could not afford to do so. The bankruptcy court did not believe that Tejeda ever contacted Golden State or that she ever tried to restore the water service. Nor did the court believe that Golden State insisted on Tejeda paying the $6,000 owed on someone else's water bill before it would restore water service to the complex.

Department of Public Health about the lack of running water in the complex. The health department arranged for a meeting in early January 2015 and informed Tejeda by phone that she needed to appear and explain why her apartment complex had no running water. The parties' accounts of what transpired at the meeting differ. Velasquez testified that the health department employee presiding at the meeting told Tejeda she could be fined if she did not provide water service to the building. In response, Tejeda supposedly said "I prefer to pay the fine, but I want everybody to leave."

After the meeting, Tejeda and Velasquez met by chance in the parking garage. Velasquez claims Tejeda told her she had called the social workers and that she should move because they otherwise would take her kids away. Tejeda denies telling Velasquez this. She further maintains that she only called the Department of Child and Family Services because the health department told her to.

In March 2015, Velasquez and her children sued Tejeda, her husband and the water utility company in the Los Angeles County Superior Court. Among other things, the lawsuit sought damages and restoration of water service to Velasquez's apartment. Velasquez vacated the apartment in fall of 2015. The lawsuit was still pending when Tejeda commenced her chapter 7 bankruptcy case in January 2017.

Velasquez filed her nondischargeability complaint in June 2017. She

sought to have excepted from discharge the damages she and her family suffered as a result of having to live without water from December 2014 until she vacated the apartment. In May 2018, the bankruptcy court held a trial, at which Velasquez and Tejeda testified. Velasquez offered compelling testimony regarding the hardships her family endured having to live without running water. She testified that the lack of running water interfered with her autistic son's home therapy and with his daily routine. She also testified that the absence of running water was a frustration and an emotional strain on the entire family. She recounted her struggles to provide her family with water by hauling up to her second-floor apartment five gallon containers full of water and how she no longer could make home-cooked meals for her children. She further recounted how they would pay to bathe at the house of a friend. After the close of evidence, the bankruptcy court took the matter under submission.

In August 2018, the bankruptcy court issued a memorandum decision ruling in favor of Velasquez on her § 523(a)(6) claim. The bankruptcy court credited Velasquez's version of events and found Tejeda not credible. More specifically, the court did not believe Tejeda's claims that she tried to restore water to the complex. Tejeda had explained that Golden State had told her it would cost $6,000 to restore the water service and that she was unable to pay that much due to her poor financial condition. However, the court found Tejeda failed to restore water service

as part of an effort to coerce all of the tenants, including Velasquez and her chidren, to move out of their apartments. Based on Velasquez's willingness to stay and pay rent, the court also found that Tejeda could afford to restore water service and pay the monthly water bill.

As for damages, the bankruptcy court awarded Velasquez statutory damages under Cal. Civ. Code 789.3(c) of $100 per day for 280 days ($28,000). The bankruptcy court explained that the $100 per day maximum daily amount of statutory damages fit the harm Velasquez and her children suffered as a result of being forced to live without running water. The court awarded Velasquez no other damages or attorney's fees.

The bankruptcy court entered its nondischargeability judgment on August 7, 2018. Tejeda timely appealed.

## JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I). We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

1. Did the bankruptcy court commit reversible error when it found that Tejeda sought to force Velasquez to move by refusing to provide water service to her apartment?

2. Did the bankruptcy court abuse its discretion by admitting into evidence Tejeda's entire deposition transcript?

3. Did the bankruptcy court abuse its discretion by admitting into

evidence testimony regarding utilities other than water?

4. Did the bankruptcy court commit reversible error by not offsetting against the damages the rent Velasquez allegedly owed to Tejeda?

5. Did the bankruptcy court unconstitutionally apply Cal. Civ. Code § 789.3 in awarding statutory damages of $100 per day?

## STANDARD OF REVIEW

In nondischargeability actions, the ultimate question of whether a claim is dischargeable is a mixed question of fact and law reviewed de novo. *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1142 (9th Cir. 2002). However, when the appellant challenges the bankruptcy court's factual findings in the action, those are reviewed under the clearly erroneous standard. *Id.* Legal rulings in the action are reviewed de novo. *Id.*

The bankruptcy court's evidentiary rulings are reviewed for an abuse of discretion and will not be disturbed in the absence of prejudice and timely objection. *Price v. Kramer*, 200 F.3d 1237, 1252 & n.17 (9th Cir. 2000); *Van Zandt v. Mbunda (In re Mbunda)*, 484 B.R. 344, 351–52 (9th Cir. BAP 2012), *aff'd*, 604 F. App'x 552 (9th Cir. 2015). The bankruptcy court abuses its discretion if it applies an incorrect legal rule or its factual findings are illogical, implausible or without support in the record. *See TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 832 (9th Cir. 2011) (citing *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc)).

10

## DISCUSSION

Tejeda has not challenged the legal standard the bankruptcy court applied to except her debt from discharge under § 523(a)(6). Nonetheless, we briefly restate the law governing § 523(a)(6) claims.

Section 523(a)(6) excepts from discharge those debts arising from a debtor's willful and malicious injury of another. An injury is considered willful when the debtor had a subjective intent to injure the plaintiff or a subjective belief that injury was substantially certain to occur. *Ormsby v. First Am. Title Co. of Nevada (In re Ormsby)*, 591 F.3d 1199, 1206 (9th Cir. 2010) (citing *In re Su*, 290 F.3d at 1142). An injury is considered malicious when it "involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." *Ormsby*, 591 F.3d at 1206 (quoting *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1209 (9th Cir. 2001)). In addition to these elements, § 523(a)(6) does not apply unless the debtor's conduct is tortious under applicable nonbankruptcy law. *Lockerby v. Sierra*, 535 F.3d 1038, 1041 (9th Cir. 2008). Tejeda has not disputed that the bankruptcy court found her liable for tortious conduct under state law. As the bankruptcy court held, California landlords can be held liable in tort for not furnishing their tenants with habitable dwellings. *Stoiber v. Honeychuck*, 101 Cal. App. 3d 903, 918–19 (1980).  Premises without running water are considered uninhabitable. Cal. Civ. Code § 1941.1(a)(3).

11

Tejeda has raised five issues on appeal. One concerns the sufficiency of the evidence relating to Tejeda's intent, two concern evidentiary issues, and the final two concern the court's monetary award. We address each in turn.

## A. Tejeda's Intent.

On the one hand, Tejeda asserts in her appeal brief that there are no disputed factual issues. On the other hand, she claims there was no evidence in the record supporting the bankruptcy court's findings: (1) that she intentionally injured Velasquez; and (2) that she purposefully refused to take the steps necessary to resume water service to Velasquez's apartment in order to harm her and coerce her to move. This argument is quintessentially a factual argument. We may reverse the bankruptcy court's intent findings only if they were illogical, implausible or without support in the record. *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010).

Tejeda's intent argument lacks merit. It relies exclusively on her own version of events. She ignores the fact that the bankruptcy court credited Velasquez's version of events and found Tejeda not credible. We must "give great deference" to factual findings based on witness credibility because the bankruptcy court had the opportunity to assess "'variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.'" *Id.* (citing *Anderson v. City of*

12

*Bessemer City*, 470 U.S. 564, 575 (1985)). Furthermore, Tejeda fails to explain how the bankruptcy court's reliance on Velasquez's testimony in making its intent finding was illogical, implausible, or factually unsupported in the record.

Velasquez's trial testimony provided ample evidence to support the bankruptcy court's inference that Tejeda refused to restore water service to Velasquez's apartment for the purpose of inducing her to move. According to Velasquez, as each one of her utilities was disconnected, Tejeda told her to move if she did not like it. Velasquez also recounted Tejeda's comments at the department of health meeting, which are telling. When threatened at the meeting with a fine unless she provided running water to her tenants, Tejeda said: "I prefer to pay the fine, but I want everybody to leave." Immediately after the meeting, Tejeda told Velasquez: "You should leave, Sorayda, because I already called the social workers and they're going to take your kids away." It was not illogical or implausible for the bankruptcy court to infer from these statements that Tejeda refused to arrange for the water to be turned back on in the apartment complex as a means of coercing her tenants to move.

One of the main themes of Tejeda's testimony was that she was too poor to reconnect the water service. She claimed that none of the tenants had been paying rent, including Velasquez, since August 2012. She further claimed that she contacted Golden State about resuming water service but

13

they refused to do so unless she paid $6,000 in past due water bills incurred while the water service for the complex was in one or more of the tenants' names. The bankruptcy court found this testimony not credible for a number of reasons. Among other things, the court noted that Tejeda's testimony about her efforts to restore water service was cursory. The court concluded that the testimony was not believable because, had Tejeda actually contacted Golden State, it would have expected her testimony regarding that contact to be much more detailed. The court further noted that Tejeda's trial testimony on this point was at odds with her deposition testimony. During her deposition, Tejeda claimed she could not recall ever contacting Golden State.

As for Tejeda's testimony that Velasquez didn't pay any rent from and after August 2012, the bankruptcy court instead chose to believe Velasquez's testimony that she paid rent until her water was disconnected in December 2014. The bankruptcy court also credited Velasquez's statement that she was ready, willing and able to resume her rent payments as soon as water service resumed. The bankruptcy court further found that, had Tejeda restored the water service, the monthly water bill would have been substantially less than Velasquez's monthly rent payments, so there was no legitimate reason why Tejeda could not afford to restore water service to the complex.

"Where there are two permissible views of the evidence, the fact

14

finder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574. In short, Tejeda has not persuaded us that any of the bankruptcy court's intent-related findings were clearly erroneous.

**B.    Admission Of Tejeda's Deposition Transcript.**

Tejeda also argues that the bankruptcy court committed reversible error when it sua sponte admitted into evidence the entire transcript from Tejeda's November 23, 2016 deposition. Tejeda contends on appeal that the court had no authority sua sponte to admit the deposition transcript into evidence. Tejeda construes Civil Rule 32(a) (made applicable in adversary proceedings by Rule 7032) as only permitting **the parties** to move into evidence deposition transcripts. But Tejeda cites no authority to support her strict construction of Civil Rule 32(a).

Generally speaking, trial courts enjoy significant discretion in deciding whether to admit party deposition transcripts used by the adverse party. *See Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 914 (9th Cir. 2008); *Mark IV Props., Inc. v. Club Dev. & Mgmt. Corp.*, 12 B.R. 854, 859 (Bankr. S.D. Cal. 1981); *see also Hub v. Sun Valley Co.*, 682 F.2d 776, 778 (9th Cir. 1982) ("Because the underlying objective is efficiency at trial without jeopardizing accurate fact finding, the district court is usually in the best position to decide whether a prior deposition should be admitted.").

More importantly, Tejeda failed to object when the bankruptcy court announced that it was going to admit the deposition transcript into

evidence. If Tejeda had objected, the bankruptcy court easily could have addressed Tejeda's concern by asking Velasquez if she wanted to move for admission of the transcript into evidence. Regardless, by failing to object during the trial, Tejeda forfeited this objection and cannot raise it for the first time on appeal. *See Price*, 200 F.3d at 1251-52; *Ocwen Loan Servicing, LLC v. Marino (In re Marino)*, 577 B.R. 772, 786 (9th Cir. BAP 2017).

**C.    Admission Of Testimony Regarding Utilities Other Than Water.**

During Velasquez's cross-examination of Tejeda, Velasquez asked Tejeda questions about electric and gas utility service. After several such questions, Tejeda's counsel objected to this line of questioning, as follows: "Objection, Your Honor. This is beyond the scope. Talking just about water. Providing – provision of water, Your Honor. This is beyond the scope of the water service." Counsel did not state whether this line of questioning was beyond the scope of direct examination, the pretrial order, or both.

The bankruptcy court overruled the objection. The bankruptcy court did not specify the basis for its evidentiary ruling. It merely stated that it was going to give Velasquez "some leeway" to ask questions about utilities other than water. After several more questions about electricity and gas, Velasquez moved on to other lines of inquiry.

As a threshold matter, its is quite doubtful that the bankruptcy court's admission of this testimony caused any prejudice to Tejeda.

Without prejudice, we will not disturb a bankruptcy court's evidentiary ruling. *See Price*, 200 F.3d at 1252 n.17; *In re Mbunda*, 484 B.R. at 351–52. Tejeda answered almost all of these questions about other utilities with answers like: "I don't know" or "I don't remember." Thus, it is questionable whether this testimony materially impacted the bankruptcy court's findings. We acknowledge that the bankruptcy court generally relied on Tejeda's overall lack of knowledge and recollection in finding Tejeda not credible. But there were many other questions about many other topics where Tejeda expressed a similar lack of knowledge or recollection. Accordingly, Tejeda's testimony regarding the electric and gas utility services was cumulative in this respect.

Even if we were to conclude that this evidentiary ruling was prejudicial, Tejeda's challenge of it lacks merit. On appeal, Tejeda has clarified or refined her objection to the admission of this testimony. According to Tejeda, the bankruptcy court should not have admitted her testimony because it was beyond the scope of the issues identified in the pretrial order. As Tejeda puts it, the pretrial order only specifically referenced factual issues concerning Velasquez's water service, so any testimony regarding other utility services went beyond the scope of the pretrial order. She further points to the order granting her motion in limine generally limiting the admissibility of evidence to those matters identified in the pretrial order.

At bottom, the bankruptcy court's evidentiary ruling on the scope of the pretrial order and the effect of the order in limine is a question of construction of the court's orders. We typically defer to the bankruptcy court's interpretation of its own orders, because it is in the best position to know what it meant when it ruled. *Rosales v. Wallace (In re Wallace)*, 490 B.R. 898, 906 (9th Cir. BAP 2013); *see also Hallett v. Morgan*, 296 F.3d 732, 739–40 (9th Cir. 2002); *Damages for Justice v. Civil Serv. Comm'n of City & Cty. of S.F.*, 934 F.2d 1092, 1094 (9th Cir. 1991). Tejeda has offered no explanation why we should second-guess the bankruptcy court's construction of its own orders or why that construction was wrong.

In any event, we agree with the bankruptcy court's interpretation. Tejeda's urged construction is too narrow. The pretrial order unequivocally raised the issue of Tejeda's intent with respect to her failure to reconnect water service to the apartment complex. The questions that Velasquez asked about other utilities were relevant to that issue. This relevance is made apparent by Velasquez's testimony regarding other utilities.[6] In her testimony, Velasquez recalled Tejeda told her that she was not going to reconnect gas or electricity and that Velasquez should move if she was unhappy about this. This testimony tends to show that, with respect to other utilities, Tejeda harbored the same intent she was found to have with

---

[6] When Velasquez was asked questions by her own counsel regarding other utilities, Tejeda did not object to any of these questions.

respect to the water service: an intent to induce her tenants to move by refusing to provide them with basic utility services. Under these circumstances, the bankruptcy court did not abuse its discretion by admitting Tejeda's testimony regarding utilities other than water.

**D.    Damages Issues.**

Tejeda's damages argument is twofold. First, Tejeda argues that the bankruptcy court erred by not offsetting the amount of rent Velasquez allegedly owed her. And second, Tejeda argues that the statutory damages the bankruptcy court imposed under Cal. Civ. Code § 789.3 were unreasonable and hence unconstitutional.

We can easily dispose of Tejeda's offset argument. Tejeda concedes that no rent was owing once the water service was disconnected in December 2014 until Velasquez moved out during the fall of 2015. *See* Cal. Civ. Code §§ 1941.1(a)(3), 1942.4(a)(1) (rent not collectible once premises is rendered uninhabitable because of the absence of running water). Instead, Tejeda contends that Velasquez owed but did not pay any rent from August 2012 to December 2014. But we already discussed, above, how the bankruptcy court credited Velasquez's version of events and how it found Tejeda not credible. In the process, the bankruptcy court specifically found that Velasquez paid her rent until the water service to her apartment was disconnected in December 2014. We also held above that the bankruptcy court's findings in this regard were not clearly erroneous. Because

Velasquez already paid her rent for the period in question, there is no unpaid rent to offset against Velasquez's damages. Accordingly, we reject Tejeda's offset argument.

Tejeda's argument challenging the constitutionality of the bankruptcy court's application of Cal Civ. Code § 789.3 requires a bit more discussion.

Cal. Civ. Code § 789.3(a) provides in relevant part that a landlord shall not, directly or indirectly, willfully interrupt basic utility services furnished to a tenant with an intent to terminate the tenant's occupancy of a residence under a lease. Cal. Civ. Code § 789.3(c)(2) directs the court to award the following against any landlord violating the statute:

(1) Actual damages of the tenant.

(2) An amount not to exceed one hundred dollars ($100) for each day or part thereof the landlord remains in violation of this section. In determining the amount of such award, the court shall consider proof of such matters as justice may require; however, in no event shall less than two hundred fifty dollars ($250) be awarded for each separate cause of action. Subsequent or repeated violations, which are not committed contemporaneously with the initial violation, shall be treated as separate causes of action and shall be subject to a separate award of damages.

The bankruptcy court did not award any actual damages to Velasquez. Instead, after considering the nature and extent of the harm Tejeda inflicted on Velasquez and her children, the court imposed the

20

maximum statutory damages of $100 per day for 280 days. On appeal,

Tejeda has not challenged the amount of days the damages were imposed.

But she does challenge the rate imposed of $100 per day. Tejeda claims this

rate was unconstitutional as applied to her. To support this argument,

Tejeda relies on *Hale v. Morgan*, 22 Cal. 3d 388 (1978). In *Hale*, the California

Supreme Court held that, under the circumstances presented, the trial court

had applied Cal. Civ. Code § 789.3 in an unreasonable and unconstitutional

manner by imposing a $17,300 award. *Id.* at 392.

However, *Hale* is distinguishable. First of all, at the time *Hale* was

decided, the $100 per day provision under Cal. Civ. Code § 789.3 was

mandatory rather than discretionary. As a result, the *Hale* court expressed

the concern that the statutory damages provision could be used as a sword

rather than a shield. As the *Hale* court reasoned,

> section 789.3 permits the occasional experienced and designing
> tenant to ambush an unknowing landlord converting the single
> wrongful act of the latter into a veritable financial bonanza.
> Such a tenant may readily choose to endure the undoubted
> hardship of no utility service in return for a sure and certain
> reward accumulating at $3,000 per month; the size of the
> instant award demonstrates the potential for abuse.

*Id.* at 403–04. After *Hale* was decided, the California legislature amended

the statute to provide courts with discretion over the size of the award by

directing the trial court to impose an amount "not to exceed" $100 per day

and directing the court to consider "proof of such matters as justice may

21

require" for purposes of determining the amount of the award. *See Kinney v. Vaccari*, 27 Cal. 3d 348, 356 n.6 (1980) (explaining 1979 amendments to statute).

Second, the facts of *Hale* are markedly different. There, a landlord owned and operated a mobile home park in South Lake Tahoe even though he resided in San Francisco. *Hale*, 22 Cal. 3d at 393. The plaintiff tenant moved his 35-foot mobile home into the park without the landlord's knowledge and consent. *Id.* Afterwards, the parties agreed to a rent of $65 per month, but for the next three months, the tenant failed to pay rent. *Id.* The landlord in May 1975 disconnected the water and electrical lines to the tenant's mobile home. *Id.* Thereafter, the tenant alternately lived in his mobile home or at his sister's residence until November 1975, when he removed his mobile home from the park. *Id.* Under these circumstances, the *Hale* court held that the mandatory imposition of $100 per day was arbitrary and unreasonable and, hence, unconstitutional. *Id.* at 404-05.

The dispute between Velasquez and Tejeda is more like *Kinney*, 27 Cal. 3d at 354-55. In *Kinney*, the California Supreme Court upheld an award of $36,000 under Cal. Civ. Code § 789.3 ($100 per day, times 6 residential units affected, times 60 days). *Id.* at 354-57. In holding constitutional the application of the statute in that case, the *Kinney* court considered all of the surrounding circumstances but particularly focused on the following three factors: (1) the landlord's motivations for his violative conduct; (2) the

22

tenants' efforts to mitigate damages; and (3) the egregious nature of the impact on the tenants arising from the violation of the statute. *Id.* at 353-55.

In *Kinney*, the defendant landlord told the tenants he intended to "throw the bums out" and that he would turn off the gas service to their rental units beginning February 1 unless they moved. *Id.* at 351. The rental units were without gas throughout February and March, even though it was the middle of winter and the lack of gas left the tenants and their minor children exposed to extreme cold. *Id.* at 355. Nor could the landlord in *Kinney* blame the disconnection of the gas on insufficient funds. The California Supreme Court noted that the amount of rent the tenants paid in January was more than enough to pay the gas bill. *Id.* at 354.

As for their mitigation efforts, the tenants in *Kinney* continued to tender their rent even though the gas already had been shut off. The landlord refused to accept it or to turn back on the gas. The tenants also did everything in their power independently to restore gas to their units. *Id.* at 354-55. When their efforts to work directly with the gas company failed, within a week of gas service being terminated, the tenants sued the landlord and sought an injunction to restore gas service to the units. *Id.*

Velasquez's and Tejeda's conduct is reminiscent of *Kinney*. The bankruptcy court found that, before the water was disconnected, Velasquez had been regularly paying more than enough rent to pay for the cost of the water service. After water service was disconnected, Velasquez first tried to

work directly with Tejeda to persuade her to resume water service. When those efforts failed, she worked with various public assistance organizations and the Los Angeles County Department of Public Health as part of her further efforts to persuade Tejeda to restore water service. When those efforts failed, Velasquez sued Tejeda and sought an injunction to restore water service.

Nor can there be any legitimate doubt as to Tejeda's motivations, particularly in light of the bankruptcy court's findings. Tejeda repeatedly told Velasquez she should move if she did not like the existing circumstances at the apartment complex. She further told a health department employee that she would rather be fined than restore water to the complex and that she wanted all the tenants to leave. Finally, Tejeda told Velasquez that, if she didn't move, the social workers were going to take her children away from her.

As for the egregiousness of the harm caused by Tejeda's conduct, we already have recounted Velasquez's testimony demonstrating the physical and emotional toll being in an apartment without running water had on her and her children. Velasquez also made it clear through her testimony that if she had possessed any means and ability to move elsewhere, she would have done so, as her adolescent daughter had urged her.

In sum, the circumstances of this case distinguish it from *Hale* and justify following *Kinney*. The bankruptcy court did not apply the statutory

24

damages provision in an unreasonable or unconstitutional manner.

## CONCLUSION

For the reasons set forth above, we AFFIRM the bankruptcy court's judgment pursuant to § 523(a)(6).